Opinion for the Court filed PER CURIAM*
Opinion dissenting in part filed by Circuit Judge SENTELLE.
Dissenting opinion filed by Chief Judge GINSBURG.
PER CURIAM.
In these consolidated appeals, we consider whether chapter 5 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-615b, creates a private right of action for an owner or operator of a payphone (hereinafter a payphone service provider, or a PSP) to recover from an interexchange carrier (IXC) the compensation for coinless payphone calls required by a regulation of the Federal Communications Commission. Before answering that question, however, we must first decide whether the plaintiffs, as the assignees of PSPs’ claims against the IXCs, have standing to sue them. We conclude the plaintiffs do have standing but the Act does not provide them a right to sue in federal court.
*82 I. Background
In 1990 the Congress enacted the Telephone Operator Consumer Services Improvement Act, Pub.L. No. 101-435, 104 .Stat. 986 (codified at 47 U.S.C. § 226), which requires PSPs to allow consumers to use an access code (e.g., “10-10-220”) or a subscriber 800 number to make a call from a payphone. See 47 U.S.C. § 226(c)(1)(B). Before then, many PSPs had blocked the use of access codes and 800 numbers because they enabled customers to “dial around” the PSP’s preselected IXC, with the result that neither the IXC nor the PSP received any payment for the call.
In its initial implementation of the Act, the Commission required IXCs to compensate PSPs only for access code calls, not for calls to subscriber 800 numbers, see Policies and Rules Concerning Operator Services Access and Pay Telephone Compensation, 6 F.C.C.R. 4736 ¶¶ 34, 36, 1991 WL 638196 (1991), clarified on recons., 7 F.C.C.R. 4355 ¶50, 1992 WL 690067 (1992), but we held that compensation scheme was not fully consistent with the 1934 Act, 47 U.S.C. § 226(e)(2), and had to be reconsidered. Fla. Pub. Telecomms. Ass’n, Inc. v. FCC, 54 F.3d 857, 859 (D.C.Cir.1995). Then, in the Telecommunications Act of 1996, the Congress instructed the Commission to devise a new plan that would “ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using them payphone[s].” 47 U.S.C. § 276(b)(1)(A). After several failed attempts, see Ill. Pub. Telecomms. Ass’n v. FCC, 117 F.3d 555, 558 (D.C.Cir.1997). and MCI Telecomms. Corp. v. FCC, 143 F.3d 606, 607 (D.C.Cir. 1998), the Commission finally crafted such a plan. See Am. Pub. Communications Council v. FCC, 215 F.3d 51, 52 (D.C.Cir. 2000) (upholding the plan). Getting the Commission to enact a regulation requiring IXCs to compensate them for dial-around calls was only half the battle for the PSPs, however; their challenge now is to collect.
Most PSPs rely upon “aggregators” to act as intermediaries between themselves and the several IXCs; an aggregator acting on behalf of a PSP submits billing information to the IXCs and pays over to the PSP the monies it receives from the IXCs. The aggregator charges the PSP a fee based upon the number of telephone lines that PSP operates. Plaintiff American Public Communications Council Services (APCCS) is the largest aggregator, representing more than 1400 PSPs, which in turn own and operate more than 400,000 payphones nationwide.
APCCS and several other plaintiff aggregators represent that certain IXCs “have failed to pay the required [dial-around] compensation for millions of calls placed over several years.” They sought authorization from their client PSPs to sue IXCs on the PSPs’ behalf, and agreed to pass back to the PSPs any amounts they recovered thereby. Each PSP then signed an “Assignment and Power of Attorney” providing, in relevant part, that the PSP
assigns, transfers, and sets over to [the aggregator] for purposes of collection all rights, title and interest of the [PSP] in the [PSP’s] claims, demands or causes of action for “Dial-Around Compensation” (“DAC”) due the [PSP] for periods since October 1, 1997, pursuant to Federal Communications Commission rules, regulations and orders.
The aggregators, purporting to act “as assignee[s] of the claims of and attorney[s]-in-fact” for the PSPs, then jointly filed lawsuits against Sprint, AT & T, and other IXCs, claiming each IXC had violated the Commission’s dial-around compensation regulation. One PSP, Peoples Tele *83 phone Company, also participated in the lawsuits as a co-plaintiff.
AT & T moved to dismiss the cases on the ground the aggregators lacked standing to sue. The district court initially agreed and dismissed all the claims of the aggregators, APCCS v. AT & T Corp., 254 F.Supp.2d 135, 137 (D.D.C.2003), but upon the aggregators’ motion for reconsideration, vacated its earlier ruling and denied AT & T’s motion. 281 F.Supp.2d 41, 45 (D.D.C.2003).
Another IXC, Cable & Wireless, moved to dismiss the single complaint against it on the grounds that the aggregators lacked not only standing but also a right of action for dial-around compensation under § 276 of the Act and the implementing regulation promulgated by the Commission. The district court denied that motion and permitted the plaintiffs to amend their complaints to assert that §§ 201(b), 407, and 416(c) of Title 47 provide alternative grounds for relief. APCCS v. Cable & Wireless, Inc., 281 F.Supp.2d 52, 57 (D.D.C.2003). (Cable & Wireless thereafter filed for bankruptcy and the case against it was stayed.) At the instance of Sprint and AT & T, the district court then certified its orders for interlocutory appeal, APCCS v. Sprint Communications Co., 297 F.Supp.2d 90, 101 (D.D.C.2003); APCCS v. AT & T Corp., 297 F.Supp.2d 101, 110 (D.D.C.2003), and we consolidated their appeals.
II. Analysis
Our review is de novo. We assume the factual allegations in the complaints are true. See Greene v. Dalton, 164 F.3d 671, 674 (D.C.Cir.1999). Because Article III standing is a jurisdictional requirement, we begin our analysis there. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94-102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).
A. The Aggregators’ Standing
Sprint and AT & T argue the aggregators lack standing to sue because they do not have “a concrete personal stake in the litigation.” As these IXCs see things, the aggregators’ “skeletal and conditional” assignments from the PSPs are insufficient to confer standing because they transfer only “bare legal title” to the claims of the PSPs, that is, the right to sue “for purposes of collection” but not the right to the recovery. Here the IXCs point out that the aggregators have promised to return to the PSPs all the proceeds from the litigation.** Further, they contend the assignments, notwithstanding their terms, are in fact “completely revocable” by the PSPs.
In terms of the “irreducible constitutional minimum” requirements for standing—injury-in-fact, causation, and redress-ability, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)—the IXCs first argue the aggregators have not suffered any injury of their own, and the assignments do not confer upon the aggregators the right to assert the injury of the PSPs. The IXCs also argue the relief the aggregators seek would not redress their purported injury because the aggregators would not keep *84 any portion of such damages as may be awarded.
There are some circumstances in which a plaintiff has standing to sue based upon an injury to someone else. Indeed, in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 773, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), the Supreme Court stated in no uncertain terms that “the assignee of a claim has standing to assert the injury in fact suffered by the assignor.” At the same time, however, the Court said that the assignee must have a “concrete private interest in the outcome of the suit” that is related to the injury asserted. Id. at 772, 120 S.Ct. 1858.
Therefore, in order to determine whether the aggregators have standing, we must first determine the effect of the assignments, which purport to transfer to them “all rights, title and interest” in the PSPs’ dial-around compensation claims. We must then determine whether the aggregators have a stake in the outcome of the suit, notwithstanding their contractual obligation to account to the PSPs for any award of damages.
1. The assignments
Sprint and AT & T offer two reasons to believe the assignments did not transfer the PSPs’ compensation claims to the aggregators so as to give the aggregators standing to sue. First, the transferred ownership interest was only “for purposes . of collection.” Second, the assignments were “completely revocable” by the PSPs.
We need not dwell upon the IXCs’ first argument The quoted phrase appears in the following context: “[The PSP] hereby assigns, transfers and sets over to [the aggregator] for purposes of collection all rights, title and interest of [the PSP] in [the PSP’s] claims, demands or causes of action” for dial-around compensation. The phrase “for purposes of collection,” which the IXCs portray as a fatal limitation, we think a mere reflection of the aggregator’s promise to pass back to the PSP whatever it is able to collect. Whether that obligation affects the aggregator’s standing is a distinct question, which we consider in Part II.A.2 below, but it certainly does not affect the validity of the assignment of the PSP’s dial-around compensation claim. The IXCs, therefore, give us no reason to believe the assignment is anything less than a complete transfer to the aggregator of the PSP’s dial-around compensation claim.
Equally unavailing is the IXCs’ contention that the assignments are “completely revocable.” By their terms, the assignments “may not be revoked without the written consent of [the aggregator].” Sprint and AT & T suggest the court should treat this provision as a mere “formality,” because APCCS sent to each of its client PSPs a letter stating: “If at any point APCCS is no longer representing you in the litigation, you will be able to pursue your claims on your own, should you so choose.” The possibility that APCCS would no longer represent a PSP in litigation does nothing, however, to suggest the PSP could revoke the assignment as long as APCCS continues to represent the PSP in the litigation. Of course, APCCS itself could repudiate the assignment and presumably would do so if it no longer wanted to represent the PSP in the litigation. In any event, the assignment itself is plain: the PSP may not revoke it without the consent of the aggregator.
Having rejected both the IXCs’ arguments challenging the effect of the assignments, we turn to the question whether the aggregators’ promise to pass along the proceeds of litigation affects them standing to sue.
*85 2. Pass back of the proceeds
Sprint and AT & T also argue the aggregators lack standing because the assignments effectively give them only the right to sue; the aggregators will reap no direct financial benefit from the suit. In that respect, Sprint and AT & T argue, the interest of the aggregators in this case is unlike that of a qui tam relator, whose standing the Supreme Court upheld in Vermont Agency, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 886. Here, the IXCs argue, the aggregators retain “no genuine economic interest” in the dial-around compensation claims as a result of them promises to pay the proceeds to the PSPs, whereas a qui tam relator benefits from the bounty he receives if his claim is successful. Id. at 772,120 S.Ct. 1858.
According to the IXCs, this case is better compared to Connecticut v. Physicians Health Services of Connecticut, Inc., 287 F.3d 110 (2002), in which the Second Circuit held that the State of Connecticut lacked standing to assert claims against an insurance company offering managed care plans to Connecticut residents. The State claimed standing on the ground that several plan participants had assigned to the State their right to seek “appropriate equitable relief with respect to any cause of action they may have as plan participants or beneficiaries.” Id. at 112. The Second Circuit concluded that Connecticut did not have a “concrete private interest in the outcome of the suit” because “[n]one of the remedies being sought would flow to the State as assignee.” Id. at 118. The assignments at issue did not “confer ‘actual’ rights or benefits ... on the State. The right to recover benefits or to seek money damages remain[ed] with the assignor.” Id. at 115. Therefore, the court held that, “[e]ven if the assignments are valid as a contractual matter, they ... merely give the State the right to act as a nominal party.” Id. at 118.
The assignments at issue here, in contrast, transfer to the assignees the entire interest of the PSPs in them dial-around compensation claims, and, as explained in Part II.A. 1 above, there is nothing to suggest the assignments were invalid. As for the question that remains — whether the aggregators’ promise to hand over any recovery to the PSPs means the aggregators have no stake in the case — Physicians Health is not helpful; it did not address the question whether an assignee that would otherwise have standing to sue loses its standing when it obligates itself to give the proceeds of the suit to another.
Still, we are not entirely without guidance. As the district court observed, the identical issue has arisen under Federal Rule of Civil Procedure 17(a): “Every action shall be prosecuted in the name of the real party in interest.” Courts and commentators agree that, if an assignment properly transfers ownership of a claim, then the assignee’s interest “is not affected by the parties’ additional agreement that the transferee will be obligated to account for the proceeds of a suit brought on the claim.” Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 17 (2d Cir.1997); see also Titus v. Wallick, 306 U.S. 282, 289, 59 S.Ct. 557, 83 L.Ed. 653 (1939) (legal effect of assignment “was not curtailed by the recital that the assignment was for purposes of suit and that its proceeds were to be turned over or accounted for to another”); James Wm. Moore, Et Al., Moore’s Federal Practice § 17.11[l][c] (3d ed. 1997) (“The assignee is real party in interest even though assignee must account to the assignor”); 6A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1545 at 348 (1990) (“[F]ederal courts have held that an assignee for purposes of collection who holds *86 legal title to the debt ... is a real party in interest even though the assignee must account to the assignor for whatever is recovered in the action”).
Sprint and AT & T counter with the observation that Rule 17(a) and the requirement of standing “are governed by different standards and serve distinct purposes.” That is true enough, as far as it goes: Standing depends in part upon elements “clearly unrelated to the rather simple proposition set out in Rule 17(a),” Fed. Prac. & Proc. § 1542 at 330. But standing also depends in part, as does a plaintiffs status as the real party in interest, upon having “a personal interest in the controversy,” Whelan v. Abell, 953 F.2d 663, 672 (D.C.Cir.1992), and that is the only requirement at issue in the IXCs’ challenge to the aggregators’ standing in this case.
We see no basis for distinguishing the personal stake required under Rule 17(a) from the interest required for standing. What the aggregators have promised to do with any recovery is irrelevant to their standing — as it would be to their status as real parties in interest. We need only be satisfied that the aggregators received a valid assignment of the claims, so that any damage award will be payable to them in the first instance. Upon that score the IXCs have cast no doubt.***
B. Private Right of Action
Sprint and AT & T contend that nothing in chapter 5 of the Communications Act authorizes a PSP to sue an IXC for failure to pay the dial-around compensation required by the regulation the Commission promulgated to implement § 276. In determining whether the Act creates a private right of action, the court’s task is straightforward: We must “interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy,” for “private rights of action to enforce federal law must be created by Congress.” Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).
1. Section 276
Section 276(b)(1) provides in relevant part:
In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public ... the Commission shall ... prescribe regulations that—
(A) establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone.
As the plaintiffs acknowledge, § 276 itself does not create a private right of action; nor does it hold a common carrier liable for failing to comply with the requirements of the Act. According to the plaintiffs, however, those gaps are filed by §§ 206 and 207, respectively.
Section 206 provides in relevant part:
In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in [chapter 5] prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in [chapter 5] required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in *87 consequence of any such violation of the provisions of [chapter 5].
And § 207 provides in relevant part:
Any person claiming to be damaged by any common carrier subject to the provisions of [chapter 5] ... may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of [chapter 5], in any district court of the United States of competent jurisdiction.
The question, then, is this: According to the allegations of the complaint, did Sprint and AT & T, which are common carriers, do something made unlawful by, or fail to do something required by, § 276? If so, then § 206 makes them liable to any person injured as a result, and § 207 permits “any person claiming to be damaged” to sue them in federal court.
The district court reasoned that § 276(b)(1)(A) “confers upon PSPs a right to be ‘fairly compensated,’ ” while the Commission’s regulation “provides the details necessary to implement” that statutory right — namely, who must compensate the PSPs, and by how much. 281 F.Supp.2d at 56. According to the district court, the regulation “implements the Congressional mandate ... by specifying what it means to be ‘fairly compensated’; as such, when a common carrier violates the regulation, it is effectively doing something ‘declared to be unlawful’ within the meaning of section 206 and is therefore subject to suit under section 207.” Id.
In Greene v. Sprint Communications Co., 340 F.3d 1047 (2003), another case brought by aggregators against IXCs on behalf of PSPs, the Ninth Circuit read the same statute quite differently. That court first observed that § 276 “does not establish a right to compensation, or to compensation by IXCs. The statute does not say ‘PSPs shall be entitled to fair compensation,’ or ‘IXCs shall pay PSPs.’ ” Viewing the “lack of rights-creating language in § 276[as] crucial,” the court held that, when an IXC fails to pay a PSP the compensation prescribed by the Commission, “there is no violation of the Act to be remedied through the private right of action afforded by §§ 206 and 207.” Id. at 1050-52.
We join the Ninth Circuit in holding that § 276 does not create a right of action for a PSP (or its assignee) to recover dial-around compensation from an IXC. As our sister circuit observed, the Supreme Court in Sandoval held that § 602 of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d-l, did not reflect an intent on the part of the Congress to create a private right of action specifically because there was no “rights-creating language” in the statute. 532 U.S. at 288, 121 S.Ct. 1511. The same is true of § 276 of the Communications Act. That section is by its terms addressed neither to the rights of PSPs nor to the obligations of IXCs. Rather, it is “yet a step further removed: It focuses ... on the agenc[y] that will do the regulating.” Id. Section 276 is addressed only to “the Commission,” which it directs to “take all actions necessary ... to ensure that all [PSPs] are fairly compensated” for the calls they originate.
Nothing in the statute requires the Commission to designate the IXC as the party responsible for dial-around payment. Indeed, as the IXCs note, the Commission identified the caller and the recipient as possible payors, and in fact it considered a “caller pays” scheme before eventually concluding that a “carrier pays” scheme was more practical. See Notice of Proposed Rulemaking, Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 11 F.C.C.R. 6716 ¶24, 1996 WL 436930 (1996); see also Greene, *88 340 F.3d at 1051 n. 3 (discussing alternative schemes the Commission considered).
Because the IXCs are not regulated by § 276, there is no way in which they could have violated that provision. They may have violated a regulation implementing § 276, but § 206 makes a common carrier liable only for violating chapter 5 itself— not for a violating a regulation issued by the Commission pursuant to chapter 5. Because it is not a violation of § 276 for an IXC to fail to pay dial-around compensation to a PSP, the plaintiffs do not have a right of action, based upon that section, against the IXCs.
2. Section 201(b)
Plaintiffs contend that even if they cannot rely on § 276, a common carrier’s failure to comply, with the Commission’s regulations violates § 201(b) of the Act, which in turn triggers the provisions (§§ 206 and 207) allowing suit in federal court. Section 201(b) provides that any “charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful.” A common carrier’s failure to compensate PSPs for dial-around calls, plaintiffs argue, is a “practice” that is “unjust or unreasonable,” and therefore “unlawful” under the Act.
At the heart of plaintiffs’ argument is the notion that it is inherently an unreasonable practice, within the meaning of § 201(b), to violate a Commission regulation. That reading would transform § 201(b) into a catchall provision, converting any common carrier’s violation of a Commission order or regulation into a violation of the Act actionable in federal court. This result is not plainly evident from the text of the Act, and nothing suggests that Congress intended its words to have such a sweeping effect.
It is important to keep in mind that the question here is not so much whether there is a private right of action, but where — directly in district court, or in the Commission. This is different from Sandoval, in which the alternative to a right of action in court was no action anywhere. Still Sandoval has something to say about the issue facing us, if only in dicta: “[W]hen a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable.” 532 U.S. at 291, 121 S.Ct. 1511.
Here, the body of the FCC’s 1999 “Order” said not a word about § 201(b). All we see is boilerplate in the ordering clause, and in the clause identifying the authority for Part 64 of the rules, citing a list of sections including “201.” (This is in marked contrast to the treatment of § 276, which the Commission mentioned throughout as the source of its authority.) It cannot be that the mere citation of § 201 displays — -in Sandoval’s words — an intent that the regulation setting the compensation level should be privately enforceable in court. Still less can it be that the mere citation of § 201 is entitled to Chevron deference as the agency’s authoritative interpretation of § 201(b). The dissent’s quotation of the following statement from Sandoval is therefore inapposite: a “Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.” 532 U.S. at 284, 121 S.Ct. 1511. There was no authoritative interpretation of § 201(b) in this case. For all we know, the Commission in 1999 never even thought about suits directly in district court. Certainly the body of the Order itself gave no clue that it did so. In fact, in some of the paragraphs talking about the PSPs compensating the carriers for overpayments, *89 the assumption appears to be that collection actions will be before the Commission (as indeed they must be in an any action by a carrier against a PSP for not making a refund). See, e.g., In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 14 F.C.C.R. 2545 ¶¶ 195-99,1999 WL 49817 (1999).
A court should be reluctant to put words in the Commission’s mouth — here, the words “unjust and unreasonable.” The Commission never, in its 1999 Order, specified that a carrier’s failure to pay was of this magnitude. Given the potential consequences to judicial dockets of the Commission’s making that finding, we should require a clear statement (and analysis) by the agency. What the Commission meant by citing § 201 at the end of its Order is anyone’s guess. If the Order itself indicated that the Commission expected payphone providers to be able to collect in judicial actions that would be another matter. But nothing in the Order .so indicates and as stated above, there is at least a suggestion that the Commission expected collection actions to be administrative. See, e.g., Ascom Communications, Inc. v. Sprint Communications, Inc., 15 F.C.C.R. 3223, 3237, 2000 WL 135252 (2000) (adjudicating a claim against Sprint for a violation of § 201(b)).
The dissent also invokes our decision in MCI Telecommunications Carp. v. FCC, 59 F.3d 1407 (D.C.Cir.1995), but the holding of that case is too narrow to be of any help in this case. MCI, as well as the line of precedent on which it relied, did not involve Commission prescriptions in general, but rather referred specifically to rate-making under § 205. Id. at 1414. The Commission’s ratemaking power is expressly defined as the authority “to determine and prescribe what will be the jtist and reasonable charge.” 47 U.S.C. § 205(a) (emphasis added). It is one thing to hold that when Congress instructs the Commission to set a “just and reasonable” rate for common carriers, their noncompliance with the rate will be considered “unjust and unreasonable”; it is quite another to extend that reasoning to encompass all Commission regulations governing common carriers. In addition, MCI involved claims brought before the Commission— not in a federal district court. When MCI is viewed in the new light of Sandoval, its value as a precedent in this case is diminished still further.
We do not say that the Commission has no power to interpret § .201(b) to encompass violations of its rules, and thereby to create private rights of action in courts when previously there were none. We do say the Commission did not attempt to exercise any such power here. Plaintiffs therefore cannot proceed under § 201(b).
3. Sections 407 and 416(c)
The plaintiffs next look to 47 U.S.C. §§ 407 and 416(c) to supply the right to sue the IXCs in federal court. Section 407 authorizes a “complainant” to petition the district court for damages based upon a carrier’s failure “to comply with an order for the payment of money within the time limit in such order.” The plaintiffs contend the regulation providing for dial-around compensation is such an “order.”
In the alternative, the plaintiffs contend § 416(c), read in conjunction with §§ 206 and 207, gives them a right of action. That provision states, “It shall be the duty of every person ... to observe and comply with [every order of the Commission] so long as the same shall remain in effect.” According to the plaintiffs, the compensation regulation is also an “order” within the meaning of § 416(c), and §§ 206 and *90 207 make the failure to comply therewith actionable in federal court.
The IXCs argue in response that the regulation at issue is not an “order” within the meaning of either § 407 or § 416(c) because that term, as used in those sections, includes only Commission decisions arising out of an adjudicatory, as opposed to a rulemaking, proceeding. They argue that to interpret “order” to include rule-making decisions makes no sense in light of § 416(a), which requires that every order be served upon the carrier’s designated agent, and of § 416(b), which authorizes the Commission “to suspend or modify its orders upon such notice and in such manner as it shall deem proper.”
We agree with the IXCs that “order” in §§ 407 and 416(c) refers only to adjudicatory and not to rulemaking decisions. Although the Communications Act does not define the term “order,” the Administrative Procedure Act does: “ ‘order’ means the whole or part of a final disposition ... of an agency in a matter other than a rule-making.” 5 U.S.C. § 551(6). We recognize that the circuits are divided over the question whether “order” as used in § 401(b), a companion provision to those at issue here, includes a decision promulgated through rulemaking. The Ninth Circuit has held that it does, reasoning that “[wjhen Congress intended the APA’s definition of a term to be incorporated into the Communications Act, it said so.” Hawaiian Tel. Co. v. Pub. Utilities Comm’n of Hawaii, 827 F.2d 1264, 1271 (9th Cir. 1987); see also Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm’n, 913 F.2d 305, 308 (6th Cir.1990) (following Hawaiian Tel. Co. and citing cases from 4th, 5th, 7th, and 8th Circuits).
We are persuaded otherwise for the reasons laid out at length by then-Judge Breyer in New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine, 742 F.2d 1, 4-9 (1st Cir.1984) (relying in part upon APA definition of “order” in concluding § 401(b) is limited to “adjudicatory orders”). We are particularly convinced that, as the First Circuit said of that provision, making §§ 407 and 416(c) applicable to Commission regulations would “interfere seriously with the well established principle that the ‘enforcement’ of the Communications Act is entrusted primarily to” the FCC, id. at 5, rather than to the district courts.
Further, the plaintiffs’ reading of §§ 407 and 416(c) would render § 201(b) superfluous: any failure to comply with a regulation, not only unjust and unreasonable practices, would be a violation of the Act and therefore actionable under §§ 206 and 207. See Alaska Dep’t of Envtl. Conservation v. EPA, 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (“It is ... a cardinal principle of statutory construction that a statute ought, upon the whole, be so construed that ... no clause, sentence, or word shall be superfluous, void, or insignificant”). And, to those provisions of § 416 that the IXCs correctly identify as inconsistent with the plaintiffs’ broad interpretation of “order,” we add § 415(1), the one year statute of limitations for filing a petition to enforce a Commission order for the payment of money. If orders included regulations, then a complainant would be able to seek enforcement of a regulation only for the first year after it is promulgated. That simply cannot be.
For these reasons, and because we agree entirely with the First Circuit’s analysis in Neiv England Telephone and Telegraph, we reject the plaintiffs’ contention they can sue the IXCs pursuant to §§ 407 and 416(c).
III. Conclusion
We hold that, as a result of the PSPs’ valid assignment of their claims to the *91 plaintiff aggregators, the aggregators have standing to sue the defendant IXCs for failing to pay the PSPs dial-around compensation as required by the regulation; that the aggregators have promised to pass back to the PSPs any recovery from the lawsuit is immaterial for the purpose of determining their standing. We also hold that none of the provisions of the Act upon which the plaintiffs rely grants them the right to sue in federal court to recover dial-around compensation the IXCs are required by regulation to pay. The orders of the district court denying the IXCs’ motion to dismiss are therefore

Reversed.

 Chief Judge GINSBURG wrote Sections I, II.A, II.B.l, and II.B.3, and Circuit Judge RANDOLPH wrote Section II.B.2 of the opinion for the court. Circuit Judge SENTELLE dissents from Section II.A with respect to the standing of the plaintiff aggregators but concurs in the judgment. Chief Judge GINSBURG dissents from Section II.B.2 and from the judgment.

 Even if the IXCs are correct that the aggregators do not have standing as assignees, we note that Peoples Telephone Company, a PSP, and two aggregators, Jaroth, Inc. and NSC Telemanagement, would still have standing. Jaroth contends it owned a 17% interest in a PSP at the time the lawsuit was filed, and NSC contends it will receive 10% of any compensation it collects on behalf of an affiliated PSP. Pan II.A, therefore, deals with the standing only of those aggregators whose interest in the lawsuit stems solely from an assignment.

 Because we conclude the aggregators have standing as assignees, we need not consider their alternative claim, which is that they have associational standing. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 344, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); Fund Democracy, LLC v. SEC, 278 F.3d 21, 25 (D.C.Cir.2002).